UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

DANIEL COBB,                                                      Case No. 3:21-cv-00416-AR

                    Plaintiff,                                **OPINION AND ORDER**

     v.

INTEL CORPORATION,

                    Defendant.

_____

**ARMISTEAD, Magistrate Judge**

      Plaintiff Daniel Cobb brings this action against defendant Intel Corporation, his former

employer, asserting three claims: wrongful discharge of his employment based on his age,

violating ORS § 659A.030, and retaliation against him because he reported age discrimination

Page  1  – OPINION AND ORDER

and nepotism, violating ORS §§ 659A.030(1)(f) and 659A.199(1). Intel moves for summary judgment on all three claims. For the reasons explained below, the court grants Intel's motion.[1]

## BACKGROUND

Intel is a technology company focused on computer processor chips, data storage, cloud computing, and the Internet of Things. (Decl. Diana Egusa ¶ 2, ECF No. 29.) Cobb began working at Intel as an at-will employee as a Senior Technical Writer/Instructional Designer in July 2000. (Egusa Decl. Ex. 2 at 1; Compl. ¶ 8.) His job responsibilities included designing, writing, and revising technical papers, product descriptions, manuals, catalogs, user guides, and technical reference materials for Intel's customers for use with Intel's products. (Egusa Decl. Ex. 3; Decl. Keith Mahoney ¶ 2, ECF No. 28.) Technical Writers at Cobb's Grade Level work closely with product developments, engineers, release teams, and other stakeholders to develop and publish technical documentation. (Mahoney Decl. ¶ 3.) From 2000 through 2017, Cobb received positive annual performance reviews, stock awards, and bonuses. (Decl. Daniel Cobb ¶ 45, ECF No. 41.)

In May 2017, Cobb began working in the Artificial Intelligence Products Group (AIPG), which was supervised by Mark Robins. Later that year, Keith Mahoney became his first-level manager, and Robins became his second-level manager. (*Id.* ¶ 46.) In a March 2018 evaluation

---

[1]    All parties have consented to jurisdiction by magistrate judge under Federal Rule of Civil Procedure 73 and 28 U.S.C. § 636(c). The court conducted oral argument on January 24, 2024.

of Cobb's performance from May through December 2017, Mahoney described Cobb's strengths as being "schedule-driven and dedicated to completing deliverables," that he delivers "high quality, on schedule customer documentation," and that he enjoys "digging into technical concepts" allowing him to convey complex topics more "directly and concisely." (Mahoney Decl. Ex. 1.)

The events leading up to Cobb's termination occurred in 2018 and 2019. In early 2018, Cobb learned from another employee that Robins hired a User Interface Engineer named Katy Spaulding. He believed that Spaulding was Robins' niece by marriage. Cobb thought that Spaulding's hire violated Intel's strict Code of Conduct, which prohibits nepotism and conflicts of interest. Cobb also was concerned that Spaulding was unaware of Intel's policies and that she could lose her job. (Cobb Decl. ¶¶ 47-49.) Cobb messaged Spaulding over Slack. (*Id.* ¶ 49; Decl. Kevin Coles Ex. 1 at 1-3, ECF No. 30-1.) After some back-and-forth Slack messages, Spaulding abruptly stopped responding to Cobb when he asked if she was related to Robins. (Cole Decl. Ex. 1 at 3.) Cobb believes that Spaulding then called Robins to discuss the matter because Spaulding failed to resume their Slack conversation. (Cobb Decl. ¶ 49.) In the spring of 2018, Cobb asked Mahoney if Spaulding was Robins' niece and Mahoney responded, "we're not talking about it." (Coles Decl. Ex. 3 (Cobb Dep.) 33:7-20, ECF No. 30-1.) Soon after, Cobb and Mahoney's working relationship soured. Mahoney began sending Cobb emails that Cobb perceives as aggressive and harassing, and confrontations between them occurred at least weekly. (Cobb Decl. ¶ 50.)

In June 2018, Mahoney began to ask questions about Cobb's retirement plans. Mahoney asked him: "When are you planning to retire?"; "How old are you?"; "After all these years you must be ready to retire?"; "Are you vested yet?"; "Do you qualify for the Rule of 75?"; and "I'd be looking forward to retirement if I were you." Mahoney also asked Cobb, "Do you dye your hair?" Cobb felt the question was insulting and embarrassing because he then dyed his gray hair brown. Mahoney's questions typically occurred in a conference room or out of earshot of others. Cobb assured Mahoney that he intended to continue working for at least four more years. (*Id.* ¶¶ 53-54.)

Roughly one month after Mahoney's retirement questions, Cobb met with a friend and former Intel manager, Jack Thornton, to discuss Mahoney's harassment. Thornton advised Cobb to work hard and look for another position at Intel. When Mahoney realized Cobb was not retiring, Cobb believes that Mahoney's actions became more overt. (Cobb Decl. ¶ 55 & Ex. 3.)

In the summer of 2018, Mahoney banned Cobb from attending team meetings that involved planning for upcoming projects. (Cobb Decl. ¶ 56.) The AIPG group, including Cobb, Mahoney, other Intel workers, and a team of engineers in Poland (the Poland team), worked on a program named Deep Learning Studio (DLS). (Cobb Dep. 46:8-15.) Cobb was to provide a User Guide and other user-oriented technical documents to developers and an important Intel customer. (*Id.* 46:16–47:10; Mahoney Decl. ¶ 10.) Cobb was asked to create and provide an HTML file set for the Poland team and the same materials in Word and PDF format for the customer. (Cobb Dep. 48:2-13; Mahoney Decl. ¶ 10.) The entire DLS team was under pressure

to coordinate responsibilities to meet a tight timeline. (Cobb Dep. 48:2-13.) Cobb missed a DLS team meeting on July 10. (*Id.* 68:16-19; Mahoney Decl. ¶ 11, Exs. 5 & 6.)

The DLS team agreed that Cobb would prepare and place a CLI Commands summary document in Google Docs to enable the entire DLS team to review it and provide comments. Although Cobb believed that the document would be reviewed in Google Docs, the Poland team wanted the document reviewed through a different tool called Git. At one point, the DLS Project Manager Bethany Dalby revised the Poland team's input, and Cobb felt that the Poland team's interaction and input was severely lacking. On July 17, Cobb emailed a Poland team member asking him to follow through on his commitments. (Cobb Decl. ¶ 57.)

Mahoney disagreed with the tone and word choice in Cobb's July 17 email to the Poland team member. (Cobb Decl. ¶ 58.) Mahoney emailed Cobb and asked that Cobb be more sensitive with his communications and suggested that he be more positive and less harsh. Mahoney admonished Cobb for using the word "chore" and for criticizing a particular person in an email thread that included several other team members. (Mahoney Decl. Ex. 8.) Cobb did not believe that the July 17 email was offensive or aggressive. (Cobb Decl. ¶ 58.) On July 19, Cobb missed another DLS team meeting. (Cobb Dep. 68:16-19; Mahoney Decl. ¶ 11, Exs. 5 & 6.)

On July 23, Mahoney and Cobb met for a one-on-one meeting at an Intel café. (Cobb Decl. ¶ 60; Mahoney Decl. ¶ 17.) Mahoney was angry and claimed that Cobb's emails were offensive, contained typos, and he complained that Cobb used profanity. The only example of poor communication that Mahoney provided to Cobb was that Cobb used the word "chore" instead of "task." Cobb promised not to use profanity. Mahoney was so upset he jerked his body

around and spat as he spoke. After the meeting, Mahoney emailed Cobb summarizing their meeting, including that Cobb was not performing to grade level and that he missed two important meetings: one where he was to present information and another where he missed key project-related information. Mahoney mentioned in the email that the Poland team had to escalate the issue about Cobb's performance. Mahoney informed Cobb that he needed to improve his communication, work onsite moving forward, and that Cobb's desire to change his job code was "now closed." Mahoney also warned Cobb that failure to improve his performance may lead to disciplinary action. Cobb was confused by Mahoney's follow-up email because Cobb was not scheduled to present anything at the missed meeting, he was unaware that the Poland team escalated any issue, and that Mahoney instigated the discussion about job codes. (Cobb Decl. ¶¶ 62-67 & Ex. 7.)

On July 25, Mahoney demanded that Cobb delete his training demonstration videos. Cobb had previously recorded his interviews with Subject Matter Experts that showed those experts using the DLS product for which he was writing the User Guide. Cobb needed the videos to prepare the User Guide and was frustrated that he was being asked to delete them because demonstration videos are common-place tools to aid technical writers. Cobb assured Mahoney that he had obtained permission from Intel's legal department to record the videos. Mahoney nevertheless insisted that Cobb delete the videos, including a video that Cobb and Dalby recorded a few days earlier. Mahoney emailed Cobb a copy of Intel's recording policy and insisted that Cobb delete all the recordings, including the one he made with Dalby. Mahoney suggested to Cobb that he could be fired if he did not delete the video, so Cobb complied with

Mahoney's instruction. When Dalby asked Cobb for the video a few days later, she became upset that the video was deleted. Intel's legal department later informed Mahoney that the videos were allowed, and Cobb believes that Mahoney made him delete the videos to sabotage his work and that Mahoney was manufacturing reasons to fire him. (Cobb Decl. ¶¶ 68-70 & Ex. 9.)

Mahoney and Cobb agreed to run deeper technical questions through the Poland team. On July 31, Cobb emailed Dalby about user roles. The next day, Mahoney informed Cobb that he was to route all his communication on the DLS project through the Poland team, and no longer through Dalby, because Dalby was "incredibly band-width constrained." (Cobb Decl. ¶ 72 & Ex. 10.)

On August 6, Mahoney and Cobb again met one-on-one at an Intel café to discuss Cobb's work performance. (Mahoney Decl. ¶ 19.) Cobb felt he was being interrogated, harassed, and intimidated by Mahoney. Mahoney was mad that Cobb was running questions through Dalby and contended that Cobb was being disruptive. Mahoney was upset about Cobb recording videos and accused Cobb of not knowing how to use the Git software. Mahoney complained that Cobb used Google Docs instead of Git, had poor communication skills with the Poland team, and Mahoney said that he had received complaints about Cobb. Mahoney told Cobb that he was not performing at senior writer level and was trending toward a rating of "Improvement Required." (Cobb Decl. ¶¶ 73-75, 79-81, 87, 96; Mahoney Decl. ¶ 19.) Mahoney also suggested that Cobb may need time off and that Cobb should seek professional help. (Cobb Decl. ¶ 85; Mahoney Decl. ¶19.)

On August 8, Mahoney sent an email summarizing their second one-on-one meeting. In that email, Mahoney said that Cobb became upset during their conversation many times and that

Cobb told Mahoney he needed to be careful. Mahoney expressed confusion about Cobb's

behavior, that he wanted Cobb to be successful, and Mahoney included a list of resources in case

Cobb was having personal issues. Cobb thought Mahoney believed he may have a disability.

(Cobb Decl. ¶ 85-86, Exs. 11-12.)

On August 21, Cobb initiated an Open Door Investigation (ODI) into Mahoney's

behavior. Intel HR representative CJ Dragen conducted the ODI. Cobb explained to Dragen that

Mahoney was on a campaign to end his employment by making several false claims of

misbehavior, refusing to provide supporting documentation for his errors, interfering with his

internal job search, and being physically intimidating during their second meeting. (Cobb Decl.

¶ 100 & Ex. 13.) Dragen investigated, finding no evidence to support Cobb's allegations of

physical threats or job search interference by Mahoney. (Egusa Decl. Ex. 9.) As to Cobb's

complaints that Mahoney was overly critical of Cobb's work, Dragen found that Cobb's work

required "multiple changes" and that the project manager made additional revisions to Cobb's

work to ensure the work was "consumable for customers." Dragen also coached Mahoney to be

clear and concise with performance expectations and offered to provide HR counseling between

Cobb and Mahoney. (*Id.*; Cobb Decl. ¶ 100.) Cobb declined to participate in counseling. Dragen

closed the ODI on September 26. (Egusa Decl. Ex. 9.)

On September 9, Cobb uploaded the HTML versions of the Alpha DLS User Guide into

Git and said that the Word and PDF versions were complete. Cobb circulated the Word version

of the User Guide on September 10. (Cobb Decl. Exs. 14-15.) On September 11, Cobb emailed

the Poland team to say that the HTML Alpha DLS User Guide file set was ready for testing, and

so Cobb's portion the project was technically done. (Mahoney Decl. Ex. 17; Cobb Decl. ¶ 105 & Ex. 16.) In Cobb's view, his documents were delivered on time. On September 12, Jacek Chrapkowski, a Poland team member, let Cobb know that the HTML version contained a temporary Intel logo that needed to be fixed. On September 18, Cobb emailed his Word version of the Alpha User Guide and Help system for sign-off with engineering and said that he was not aware that the team planned to place a Word version of those two documents into Git. On September 19, Cobb was informed by the Poland team that a "protext scan" revealed that the HTML versions contained protected code and could not be included in the Alpha release, so the PDF versions would have to be used for delivery to the customer. (Cobb Decl. ¶¶ 101, 106 & Exs. 18-19, 21.)

In October 2018, the AIPG received a Division Recognition Award (DRA) for delivering the DLS Alpha version. Cobb's name was excluded from the DRA. (Cobb Decl. ¶ 111.)

On October 31, Mahoney gave Cobb a Written Warning (WW) and Corrective Action Plan (CAP). (Cobb Decl. ¶ 112; Mahoney Decl. Ex. 21.) In the WW/CAP, Mahoney identified several issues with the quality of Cobb's work, his ability to meet deadlines, his ability to problem-solve, follow departmental standards, and said that Cobb's deficiencies negatively affected the customer and caused the team to perform unneeded re-reviews. (Cobb Decl. Ex. 22; Mahoney Decl. Ex 21.) The WW/CAP identified expectations and measurements, such as delivering "all schedule & project-related items completely, correctly, and on time and send[] manager a weekly confirmation." The WW/CAP also stated that failure to make sufficient progress and improvement within 60 days could result in termination. Under the WW/CAP,

Cobb could "voluntarily resign and receive a buyout severance package as an alternative to working through the expectations of the written warning." (Mahoney Decl. Ex. 21.)

On November 5, Cobb filed another ODI. In it, Cobb asserted that Mahoney gave him a WW/CAP "based on fabricated, false, and highly inflated statements." Cobb informed HR that Mahoney had a personal grudge against him and was "intent on ending his employment for no apparent reason, other than perhaps my age?" Intel's ODI investigation was conducted by Suzanne Fowler and Cortney Rothman-Ivy, who had deep technical writing expertise. (Egusa Decl. Exs. 10-11.)

On November 11, Mahoney told Cobb that he was leaving for an extended vacation (November 14 to December 10) and could not be reached. (Cobb Decl. ¶ 158.) While Mahoney was out, the DLS team was responsible for preparing to release the Beta version of the project and Cobb would have to finish Mahoney's Beta Installation Guide. (Burgess Decl. Ex. 2, (Mahoney Dep.) 99:11–101:2, ECF No. 40-2.) Before he left, Mahoney told Cobb that only two issues remained to be completed on the Installation Guide. Soon after Mahoney left, however, the Poland team informed Cobb that the Installation Guide .MD markdown version in Git was not the same as Mahoney's Word version. This error required Cobb to spend two days reconciling the two versions and put Cobb behind on his own work. (Cobb Decl. ¶¶ 154, 157.)

On November 17, Cobb circulated his Beta User Guide for final review and sign-off, which incorporated content from other DLS team members. On November 29, Poland team member Darius Szyfelbein reviewed a second version of the Beta User Guide (Beta Review II) and informed Cobb that 46 items were yet to be fixed from his first review, and that he added 28

new comments to Beta Review II. (Coles Decl. Ex. 5; Cobb Decl. Ex. 28.) The next day,

Szyfelbein informed Cobb that he added 16 new comments to the Beta Installation Guide, and

that 19 items remained to be fixed from his comments to the Alpha release. (Cobb Decl. Ex. 29.)

On December 2 and 3, Cobb traded emails with Szyfelbein about the Beta User Guide, and on

December 3, Cobb circulated a revised Beta User Guide that incorporated the lion's share of

Szyfelbein's comments. (Coles Decl. Ex. 6; Cobb Decl. Ex. 30.) On December 3, the Poland

team stated that Cobb's changes to the User Guide were satisfactory, and that they would set up a

meeting to discuss any outstanding issues. That day, Cobb also completed the Release Notes and

finalized the Beta Installation Guide, reconciling the comments from Szyfelbein. The Beta

versions of the User Guide, Installation Guide, and Release Notes were completed for Intel's

customer in Word, PDF, and HTML on time Monday, December 3, 2018. (Cobb Decl.¶¶ 158-59,

Exs. 33-34; Coles Decl. Exs. 4-5.) On December 10, Szyfelbein informed Cobb that several

comments from the pull requests were not included in the Beta User Guide. (Coles Decl. Ex. 6.)

In January 2019, the DLS project was cancelled and moved to open source under the

name Nauta; Cobb's Word and HTML versions of the User Guide were not used for the Nauta

Open Release. Cobb received special recognition from Carlos Humberto Morales for his hard

work moving Nauta to open source on January 25, 2019. (Cobb Decl. ¶ 199 & Ex. 35.)

Cobb believes that Mahoney took vacation after giving him the WW/CAP to put

additional pressure on him and increase his likelihood of failure. Mahoney knew that the DLS

project would be cancelled and that Cobb's efforts in finalizing the User Guide materials in

Word and HTML ultimately would be useless. (Cobb Decl. ¶¶ 155, 200.)

In mid-January 2019, Cobb was interested in transferring departments. On January 18, Cobb interviewed with the RA4 Advance Technology Group. Cobb asked Human Resources when his WW/CAP expired and was told December 31, 2018. Cobb also spoke with the AIPG operations manager, Wanda McKenzie, on January 29, and explained that he was seeking to transfer. McKenzie expressed that she would help Cobb. (Cobb Decl. ¶¶ 202, 206 & Exs. 36-38.)

On January 29, Mahoney informed Robins, Regis, and Dragen that Cobb had not satisfied the expectations set out in the WW/CAP. (Cobb Decl. ¶ 207; Mahoney Decl. ¶ 29 & Ex. 23.) On February 6, Mahoney terminated Cobb's employment effective February 15. (Mahoney Decl. ¶ 30.)

On February 9, Cobb launched a third ODI challenging his termination. In that ODI, Cobb acknowledged that he failed to timely deliver markdown versions of the User Guide and Installation Guide yet asserts that Mahoney sabotaged him by leaving town during the Beta release deadline and by leaving him with an Installation Guide that had several errors and doubled his workload. Cobb also expressed concern that no one else would hire him at his age and requested that he be reinstated. Cobb viewed Mahoney as insecure, that Mahoney treated him as a threat, and that his inquiry about nepotism led to his termination. (Egusa Decl. Exs. 14, 16.)

On April 13, Anil Gupta, a manager with the Advance Technology Group emailed Cobb to ask if he was still interested in the technical writer position. Cobb responded that he remained interested, but needed to wait until it was cleared with Intel's legal department. Cobb was informed that he could only return to work at Intel as a contractor, earning around $85,000

annually (or roughly half his previous annual compensation of $168,000.) (Cobb Decl. ¶¶ 209, 211 & Ex. 40.) On May 17, the ODI investigation upheld his termination. (Egusa Decl. Ex. 18.) In June 2019, Mahoney hired Cobb's replacement – a 60-year-old technical writer with 20 years of experience. (Mahoney Decl. ¶ 31 & Ex. 24.)

## LEGAL STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party seeking summary judgment bears the burden of establishing the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates no issue of material fact exists, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A party cannot defeat a summary judgment motion by relying on the allegations set forth in the complaint, on unsupported conjecture, or on conclusory statements. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Summary judgment thus should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In determining whether to grant summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Curley v. City of N. Las Vegas*, 772 F.3d 629, 631 (9th Cir. 2014); *Hernandez*, 343 F.3d at 1112. All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). But deference to the nonmoving party has limits. The nonmoving party

must set forth "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Chong v. STL Int'l, Inc.*, 152 F. Supp. 3d 1305, 1309 (D. Or. 2016). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

## DISCUSSION

Cobb brings three claims: (1) age discrimination under ORS § 659A.030(1)(a); (2) retaliation for reporting age discrimination under ORS § 659A.030(f); and (3) retaliation in violation of Oregon's whistleblower statute, ORS § 659A.199. Intel moves for summary judgment on all three claims.

## A.        *Age Discrimination – Disparate Treatment*

Oregon law prohibits an employer from discharging from employment because of age if the individual is older than 18. ORS § 659A.030(1)(a). "The Ninth Circuit has described ORS § 659A.030 as 'Oregon's parallel age discrimination statute' to the federal Age Discrimination in Employment Act of 1967 (ADEA), *Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 810 (9th Cir. 2004), and courts in this district have analyzed age discrimination claims under these statutes under the same framework." *Hunter v. FedEx Corp. Servs., Inc.*, No. 3:22-cv-1217-SI, 2024 WL 1020870, at *2 (D. Or. Feb. 21, 2024). Consequently, for resolving motions for summary judgment, the court applies the framework for assessing an age discrimination

claim under the burden-shifting framework described by the Ninth Circuit, which is determined in three steps: (1) plaintiff must make a *prima facie* case of discriminatory motive; (2) the employer then must articulate a legitimate nondiscriminatory motive; and (3) finally, the employee must show that the articulated reason is pretextual.[2]  *Opara*, 57 F.4th at 721-23.

### 1.    Step one: *prima facie* case

A plaintiff may establish a *prima facie* case in two ways: by "producing direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant's contested conduct" or "using the *McDonnell Douglas* framework." *Opara v. Yellen*, 57 F.4th 709, 721 (9th Cir. 2023) (simplified). Under *McDonnell Douglas*, the factors for showing age discrimination are: (1) membership in a protected class; (2) satisfactory job performance; (3) discharge; and (4) replacement by a "substantially younger employee with

---

[2]    The parties dispute the causation standard for age discrimination claims, with Cobb asserting a "substantial factor" causation standard and Intel asserting a "but for" causation standard. However, this case is at the summary judgment stage, and the "but for causation" standard that Intel asserts is meant for trial. *See Hunter v. FedEx Corp. Servs., Inc.*, No. 3:22-cv-1217-SI, 2024 WL 1020870, at *3 (D. Or. Feb. 21, 2024) (observing that "the law of the Ninth Circuit continues to require that district courts apply the *McDonnell Douglas* burden-shifting framework to ADEA claims and claims under the parallel Oregon age discrimination law at the summary judgment stage" (citing *Dawson v. Entek Int'l*, 630 F.3d 928, 935 (9th Cir. 2011))).

equal or inferior qualifications." *Id.* at 722 (quoting *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000)); *Siring v. Or. State Bd. of Higher Educ.*, 927 F. Supp. 2d 1030, 1052 (D. Or. 2012). Cobb, however, cannot establish a *prima facie* case under the *McDonnell Douglas* framework because it is undisputed that his replacement was 60 years old and had 20 years of experience. If confined to the *McDonnell Douglas* factors, Intel would prevail on summary judgment because Cobb cannot make his *prima facie* case. (Egusa Decl. ¶ 17, Ex. 15; Mahoney Decl. ¶ 31.) The court therefore proceeds to analyze Cobb's age discrimination claim under the first described in *Opara*—direct or circumstantial evidence of discriminatory motive. Under that approach, the degree of proof necessary to establish a *prima facie* case is minimal. *Opara*, 57 F.4th at 722 (citing *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996) ("When a plaintiff . . . seeks to establish a prima facie case through the submission of actual evidence, very little such evidence is necessary.")).

Intel disputes that Cobb has established a *prima facie* case, contending that Cobb cannot show that he was performing to its expectations. Intel points to evidence showing that in the months before Cobb's termination, Mahoney inquired with Intel's HR department about managing Cobb's performance; performance issues continued; he was given a written warning and placed on a corrective action plan; and that his performance declined and he was terminated. Intel also argues that Cobb's own assessment of his performance cannot raise a genuine issue of material fact. (Def.'s Reply at 6, ECF No. 42 (citing *Coleman*, 232 F.3d at 1285).)

As noted, the amount of evidence Cobb must produce at this stage is minimal. He has met it. Cobb has shown that he was performing well until Mahoney became his supervisor,

highlighting that he was employed by Intel for nearly 19 years, and that his performance reviews – including the 2017 review – were positive. (Mahoney Decl. Ex. 1.) After Mahoney became his supervisor, he faced repeated questions by Mahoney about retirement and was asked about dyeing his hair. (Pl.'s Resp. at 39.) Because "very little" evidence is needed to establish a *prima facie* case of age discrimination and all uncertainties must be resolved in Cobb's favor, *Opara*, 57 F.4th at 725, those circumstances sufficiently give rise to an inference of discrimination and Cobb has established a *prima facie* case of age discrimination.

    **2.**    **Step Two: Legitimate, Nondiscriminatory Reasons**

    If a plaintiff establishes a *prima facie* case, then the "burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Opara*, 57 F.4th at 723 (simplified). Cobb concedes that Intel has articulated legitimate, nondiscriminatory reasons for his termination and, therefore, the court turns directly to whether Intel's rationales for Cobb's termination are pretextual. (Pl.'s Resp. at 39-40.)

    **3.**    **Step Three: Pretext**

    The burden shifts back to Cobb to demonstrate that Intel's reasons for his termination were merely a pretext for discrimination. A plaintiff asserting age discrimination can "prove pretext in multiple ways, either: (1) directly, by showing that unlawful discrimination more likely than not motivated the employer; (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable; or via a combination of these two kinds of evidence." *Opara*, 57 F.4th at 723

(quoting *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1127 (9th Cir. 2000)) (simplified); *France v. Johnson*, 795 F.3d 1170, 1175 (9th Cir. 2015).

Although "very little evidence is necessary to raise a genuine issue of fact regarding an employer's motive," *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004) (simplified), when an employer provides "abundant and uncontroverted independent evidence" to suggest discrimination did not occur, a "plaintiff's creation of only a weak issue of fact as to whether the employer's reason was untrue will not suffice." *Opara*, 57 F.4th at 724 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)). The plaintiff retains the ultimate burden of persuasion that "an employer's contested action was 'due in part or [in] whole to discriminatory intent.'" *Opara*, 57 F.4th at 724 (quoting *McGinest*, 360 F.3d at 1123).

The court agrees with Intel that Cobb has not shown pretext directly. Mahoney's questions about Cobb's retirement and whether Cobb dyed his hair are not direct evidence of a discriminatory motive. "Direct evidence typically consists of clearly sexist, racist, [ageist,] or similarly discriminatory statements or actions by the employer." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005). And direct evidence must be "directly tied to the adverse employment decision." *France*, 795 F.3d at 1173. The questions about retirement and hair color are not overtly ageist and require an inference that they were used as a proxy for age. Cobb does not argue, or present evidence showing, that the questions were tied to Mahoney's decision-making. Thus, the court considers the questions cumulatively with other circumstantial evidence on pretext. *France*, 795 F.3d at 1173 (holding retirement discussions were not direct evidence but should be considered with indirect, circumstantial evidence of pretext); *Coleman v. Bay Area*

*Health Dist.*, Case No. 6:18-cv-01787-MC, 2020 WL 1663377, at *4-5 (D. Or. Apr. 3, 2020)

(statements about retirement and when employee planned to retire are not direct evidence of age

discrimination).

Turning to the indirect path, Cobb argues that Mahoney's assessment of his performance

was "objectively without merit" and "baseless":

> Mahoney placed Cobb on a CAP premised on these demonstrably false
> accusations of performance and behavior problems. Most telling is that from the
> time when the CAP was put in place until the CAP period ended, Mahoney could
> not identify anything that Cobb did that violated the expectations in the CAP.
> Indeed in its motion for summary judgment, the only conduct Intel relies on is the
> baseless claim that after the Beta release, errors were found in Cobb's work. In
> fact, those error were discovered ***before*** the release and the errors were
> Mahoney's, not Cobb's.
>
> . . . On July 17, 2018, [Mahoney] baselessly attacked Cobb for using the word
> "chore." In the succeeding three months Mahoney made repeated demonstrably
> false accusations concerning Cobb's performance which culminated in a CAP.
> Then when Cobb succeeded in performing to the CAP's expectations, Mahoney
> relied on his own errors and false claims to terminate Cobb's employment. This
> timeline shows that the proffered reason for terminating Cobb's employment was
> pretextual.

(Pl.'s Resp. at 41-42.) Because Mahoney's concerns about Cobb's performance arose soon after

his questions about Cobb's retirement, in Cobb's view, a reasonable juror could find that Intel's

proffered reasons for his termination were pretextual.

Intel responds with four arguments. One, Cobb's contention that the CAP is "baseless" is

premised purely on his own assessment of his performance, and thus cannot create a genuine

issue of fact for trial. Two, Cobb has not shown that Intel's reasons for terminating him are

inconsistent, incoherent, implausible, or unbelievable such that a reasonable jury could find them

unworthy of credence. Three, no discriminatory inference can be drawn based on the temporal

proximity between Mahoney's questions and performance criticisms because Mahoney raised

performance concerns six weeks before Cobb contends that he "made it clear he was not

retiring." (Pl.'s Resp. at 13.) And four, even when viewing Cobb's evidence cumulatively, it fails

to show that Intel's performance-based reasons for Cobb's termination are unworthy of credence

and fails to create a genuine issue that Intel instead was motivated by impermissible age-based

discrimination.

　　　Cobb fails to identify circumstantial evidence from which a reasonable factfinder could

conclude that Intel's proffered reasons were pretextual. For example, it is undisputed that Cobb

missed two project meetings in July 2018, and that soon after, Cobb was warned that he needed

to improve his performance. (Mahoney Decl. Exs. 5-7; Cobb Dep. 68:16-19.) Although Cobb

now disputes the importance of the two meetings and whether he was scheduled to present

something, at the time, Cobb reported otherwise. After missing the meetings, Cobb sent

Mahoney an email stating that he was "distraught" and "in a panic," and in his deposition, Cobb

admitted that he was embarrassed that he missed the meeting and he acknowledged that the

meetings were a "core part of my job" and that losing his job at Intel "would truly be a financial

disaster, especially at my age." (Mahoney Decl. Ex. 7; Cobb Dep. 68:23–69:8.)

　　　Intel also provides ample, consistent reasons for its determination to issue the WW/CAP

in November 2018. In that document, Mahoney detailed many issues with Cobb's work,

including: Cobb failed to use Git instead of Word to conduct reviews with the Poland team; his

Alpha User Guide contained errors, typos, and was missing information which caused multiple

re-reviews by other team members; he consistently missed deadlines and failed to timely provide the HTML User Guide to the DLS team; and his HTML User Guide was not ultimately provided to the customer. (Mahoney Decl. Ex. 21.)

Cobb disputes that the DSL team agreed to work exclusively in Git, contends that Mahoney's work also contained errors and typos, and that Mahoney was not proficient in Git. (Cobb Decl. ¶¶ 78, 116, 147.) According to Cobb, the DSL team agreed to work in Google Docs for some of their work, citing an email he drafted on July 17, 2018, asking a Poland team member to review the CLI commands help file, and that Mahoney also asked the Poland team member to review the Google document. (Cobb Decl. Ex. 4; Mahoney Decl. Ex. 8.) Cobb further highlights that Mahoney asked him to prepare some documents in Word, and that disciplining him for using Word is unfair. (Cobb Decl. ¶ 115; Burgess Decl. Ex. 2, Mahoney Dep. 79:25–80:16.) Mahoney did not inform him that he was working in the wrong repository or that he was to exclusively use Git, and in Cobb's view, Mahoney's criticism is false, hypocritical, and a pretext for age discrimination. (Cobb Decl. ¶¶ 115, 145.) Cobb also argues that he completed his HTML User Guide "on time and as directed." (Cobb Decl. ¶ 119.) Cobb points to various emails in which he stated that he uploaded his HTML files into Git and that the Word and PDF versions of his documents were available for review. (Cobb Decl. Exs. 15-20.)

Conversely, Intel cites an email that provided a deadline of September 3 to 7 to complete documents for content review. (Mahoney Decl. Ex. 15 (setting deadlines), Ex. 12 (updating WIKI for project tracking, and Mahoney needing to set calendar reminders).) And Intel provides a September 19 email from a Poland team member showing that several hours after Cobb

provided updated HTML files, an intellectual property "protext scan" of the HTML files

discovered code that could not be reconciled in time for the Alpha release, and that the HTML

files would be excluded from release to the customer. (Mahoney Decl. ¶ 24, Ex. 18.)

       Viewing this evidence in the light most favorable to Cobb, it appears there was some

misunderstanding between Cobb, Mahoney, and the Poland team about when Cobb was to use

Git and for which specific tasks, and what Cobb's deadline was for submitting his final Alpha

User Guide. But to the extent that such discrepancies exist, they are not material because they do

not show that Intel's reasons for disciplining Cobb are false or baseless. None of Cobb's

documents refute Mahoney's expected deadline for Cobb's Alpha User Guide HTML version.

And Cobb's interpretation of those various emails does not show that the customer received his

HTML User Guide, or that his work did not need additional reviews by other team members.

And Cobb's challenges to the factual bases underlying the WW/CAP do not show that Mahoney

honestly did not believe his own assessment of Cobb's performance. *See Dep't of Fair Emp. &*

*Housing v. Lucent Techs.*, 642 F.3d 728, 746 (9th Cir. 2011) (expressing that to show proffered

reasons unworthy of credence, employee "can not simply show the employer's decision was

wrong, mistaken, or unwise") (internal quotation marks and citation omitted). Therefore, Cobb

has not presented any evidence showing that Mahoney did not believe that Cobb failed to meet

deadlines, that his work required revisions, and the numerous other performance deficiencies

identified in the WW/CAP. *Id.* (stating employee must produce evidence that shows "such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence").

More importantly, Cobb offers no evidence showing that disciplining him for failing to meet deadlines or failing to timely complete customer-bound documents are a cover for age discrimination or that Intel's other multiple performance-based reasons are unreliable. *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996) (holding that employer entitled to summary judgment where employee did not "adduce any evidence that calls into the question the veracity of Schindler's explanation").

At bottom, Cobb's challenges to Intel's reasons for issuing the WW/CAP are based on his own subjective belief about his performance and his own interpretation of emails, which fail to create a genuine issue that Intel's stated reasons are inconsistent or false. *See Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) ("[A]n employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact."); *Ozgur v. Daimler Trucks N.A. LLC*, Case No. 3:19-cv-00423-JR, 2020 WL 5638719, at *8 (D. Or. July 15, 2020), *adopted* 2020 WL 2637392 (Sept. 21, 2020), *aff'd* 2021 WL 4776994 (9th Cir. Oct. 13, 2021) (recognizing that employee's personal subjective beliefs about his own performance are inadequate to create an issue of fact on pretext).

Cobb also argues that Intel's proffered reasons for terminating him are baseless because the errors in the Beta Release are Mahoney's, not his. (Pl.'s Resp. at 41-42.) According to Cobb, weeks before the Beta Release in November 2018, Mahoney departed on a month-long vacation, leaving him to complete Mahoney's incomplete and error-laden Installation Guide. Cobb cites a

November 30, 2018 email from a Poland team member noting there were 19 issues that had not been fixed after the Alpha review, and that he added 16 new comments after reviewing the Beta version of the Installation Guide. (Cobb Decl. Ex. 29.) In Cobb's view, he resolved and incorporated all the reviewer's comments before delivering the Beta release documents on time on December 3, 2018. (Cobb Decl. ¶ 163, 166, Ex. 30.) Mahoney's failure to correct the errors before going on vacation, Cobb posits, doubled his workload, and confirms that Mahoney was attempting to sabotage his career while he was working through the CAP. (Cobb Decl. ¶ 154.) Cobb contends that Intel erroneously points to mistakes that Mahoney made as a basis for his termination and shows its reasons are pretextual.

Even if errors in the Installation Guide were Mahoney's fault, that fact does not show that Intel's proffered explanation is unworthy of credence. Although Cobb argues that Mahoney could not identify how he failed to satisfy the CAP, Cobb does not contest the nine-page document in which Mahoney responds to the CAP for the Beta Release in November 2018 and Open Source Release in January 2019 (CAP Response) that was the basis for his termination. (Mahoney Decl. Ex. 23.) In the CAP Response, Mahoney details how Cobb did not meet many requirements, including: that Cobb's customer-bound copies of the documentation were delivered late; he failed to include necessary people on an email to obtain the final signoff for the Beta Release project; he failed to include feedback from a key stakeholder in the final version of his Beta User Guide; his Beta User Guide was delivered in the middle of the night, resulting in a delayed release; he failed to deliver all the files on time for the Open Source release; he incorporated some feedback from reviewers and not others and did not communicate effectively;

the Open Source release was delayed because it contained mistakes; and he used Word for the

Beta Release, which caused frustration for stakeholders. (Mahoney Decl. Ex. 23; Coles Decl. Ex.

6.)

The CAP Response was not just based on Mahoney's assessment; it included several

statements from stakeholders critical of Cobb's performance for the Beta and Open Source

Releases. One noted that Cobb either "misunderstood or apparently ignore[d]/rejected"

suggested revisions to Cobb's documents; another noted he was "really pissed off" that the PDF

for Open Source was not completed because it was a "simple logo change [that] should have

taken 5 min[utes]." (Mahoney Decl. Ex. 23, ECF 28-1 at 64, 68.) The Poland team expressed

frustration because Cobb delivered his Beta User Guide in the middle of the night, causing a

delayed release in Europe, noting "you realize that 7:00PM PST is 4:00AM Wed. in Europe?"

(Mahoney Decl. Ex. 23, ECF No. 28-1, at 66.) Cobb does not contest those criticisms from

stakeholders or offer evidence to refute them. Cobb likewise does not argue that the Poland team

harbored ageist animus. *See Buhl v. Abbott Labs.*, 817 F. App'x 408, 411 (9th Cir. 2020)

(upholding summary judgment where employee failed to "offer[ ] any other evidence from

which a jury could find that [employer's] dissatisfaction and performance – dissatisfaction that

was expressed by multiple [coworkers and supervisors] on multiple occasions over multiple

months – was feigned"). Moreover, Cobb has not shown that Intel did not honestly believe the

criticisms offered by those stakeholders. *Opara*, 57 F.4th at 727 (stating disagreement with

employer's assessment of employee's conduct did not establish falsity); *Villiarimo v. Aloha

Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (expressing that "courts only require that an

Page  25  – OPINION AND ORDER

employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless" (simplified)).

Viewing this evidence in the light most favorable to Cobb, he has not shown that Intel's stated reasons are unworthy of credence or that the real reason for termination was age discrimination. *Opara*, 57 F.4th at 726 (providing that employee cannot prevail at pretext stage by producing only "uncorroborated and self-serving testimony") (quotation marks omitted); *Bradley*, 104 F.3d at 270 ("[A]n employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact.").

Next, Cobb argues that the temporal proximity between Mahoney's questions about his retirement and his hair in June 2018, and Mahoney's "campaign" to sabotage his reputation and issuing a written warning and corrective action plan in November 2018, and his termination in February 2019 permit an inference of age discrimination. According to Cobb, Mahoney's repeated questions about his retirement combined with the "baselessness of the discipline imposed," allows a reasonable factfinder to infer that the real reason for his termination was age discrimination, relying on *France*, 795 F.3d at 1176. (Pl.'s Resp. at 43.) The court disagrees.

In that case, France, a United States border agent, applied for one of four newly created positions, which would be a promotion from France's GS-14 level to a GS-15. Some six month earlier, France's supervisor Gilbert stated during a staff meeting that Gilbert preferred "young, dynamic agents" for the new GS-15 positions. Gilbert also had repeated discussions with France about retirement, including asking him if he would teach firearms as a "rehired annuitant," to which France responded he did not want to retire. Gilbert also asked France about his retirement

plans, and France informed Gilbert that he was not going to retire and that he planned to apply for the GS-15 position. In response, Gilbert said that "if he were in France's position, he would retire as soon as possible." Gilbert was on the interviewing panel, and the panel made recommendations to Chief Aguilar, who in turn made recommendations to Deputy Commissioner Ahern who made the final hiring decision. Of the 24 people that applied for the GS-15 position, France was the oldest at 54; the selected candidates were 44, 45, 47, and 48. After being passed over, France brought an age discrimination case. *Id.* at 1172.

On summary judgment, Gilbert and Aguilar stated they did not recommend France for the GS-15 position because he lacked leadership skills, among other reasons. France presented his retirement discussions with Gilbert and the statement he overheard that Gilbert preferred younger agents for the position. France also submitted affidavits from other border agents corroborating that Aguilar and Gilbert preferred to promote younger, less experienced agents. *Id*. The trial court dismissed at summary judgment. Reversing, the Ninth Circuit determined that France established a triable issue on pretext based on circumstantial evidence. *Id.* at 1175. The *France* court found that the trial court erred in concluding that Gilbert played a limited role in the hiring decision and in excluding Gilbert's questions about retirement when considering the universe of circumstantial evidence. *Id.* at 1176. "The retirement talks occurred from June to November 2007; the GS–15 positions were posted a couple of months later in January 2008 and the promotion decisions were made in June 2008. The close proximity in time could allow a reasonable fact finder to find by a preponderance of the evidence that France's non-selection based on grounds other than age was pretextual." *Id.* at 1177.

Cobb argues that, like *France*, the proximity in time between when he "indicated he would not retire and when Mahoney began his campaign of baseless attacks on Cobb was within one month" and supports an inference of causation. (Pl.'s Resp. at 43-44.) The court finds *France* distinguishable.

According to Cobb, the July 17, 2018 email was Mahoney's first criticism of his performance. (Cobb Resp. at 13, 42.) Yet there is evidence that Mahoney's performance concerns arose earlier. Intel presents evidence that in early June Mahoney raised concerns about Cobb's tone and use of profanity, stating that "I'm finding his approach caustic, *and not* the response of a Senior Professional." (Mahoney Decl. Exs. 3 & 7.) In *France*, Gilbert and Aguilar expressed a preference for younger agents, statements that were corroborated by two other border agents. *Id.* at 1172. Unlike *France*, Cobb presents no evidence that Mahoney expressed a preference for younger technical writers, and it is undisputed that Cobb's replacement was 60 years old and well-qualified. And, unlike *France*, Cobb presents no evidence corroborating his view that Mahoney's criticisms were baseless or unfounded; instead, that assessment is largely premised on his own subjective views of his own performance. On this record, the timing of Mahoney's retirement questions, when viewed in totality with the remaining evidence, does not support an inference that Intel's proffered performance-based reasons are pretext for age discrimination.

Therefore, viewing the evidence cumulatively in the light most favorable to Cobb fails to establish a triable issue of pretext. The questions about retirement and Cobb's hair color are a "weak issue" as to discriminatory motive and, when compared against the backdrop of "abundant

and uncontroverted independent evidence that no discrimination has occurred," Cobb has failed

to carry his ultimate burden of persuasion. *Opara*, 57 F.4th at 726. Therefore, Intel prevails on its

motion for summary judgment on Cobb's discrimination claim under ORS § 659A.030(1)(a).

**B.**  **Cobb's Retaliation Claims Under ORS §§ 659A.030(1)(f) and 659A.199**

In his complaint, Cobb alleges that Intel retaliated against him for reporting and

complaining about age discrimination under ORS § 659A.030. (Compl. ¶ 29.) Cobb also brings a

claim under Oregon's whistleblowing statute, ORS § 659A.199, alleging that he suffered

retaliation for reporting nepotism, which he believed violated Intel policy, state law, or state

regulations. (*Id.* ¶¶ 40-44.) Intel moves for summary judgment on both retaliation claims.

Because the legal standards do not materially differ, the court sets out the standards, then

analyzes each claim.

ORS § 659A.030(1)(f) makes it unlawful for an employer to "discharge . . . any person

because that other person has . . . opposed any unlawful practice . . . or has attempted to do so."

Section 659A.199(1) also makes it unlawful to discriminate or retaliate against an employee

because the employee has "in good faith reported information that the employee believes is

evidence of a violation of a state or federal law, rule or regulation."

At the summary judgment stage, it is well established in this district that retaliation

claims under ORS §§ 659A.030(1)(f) and 659A.199 follow the *McDonnell Douglas* burden-

shifting framework. *See, e.g.*, *Tornabene v. Nw. Permanente, P.C.*, 156 F. Supp. 3d 1234, 1248

(D. Or. 2015); *Larmanger v. Kaiser Found. Health Plan of the Nw.*, 895 F. Supp. 2d 1033, 1053

(D. Or. 2012). To establish a *prima facie* case of age-based retaliation, Cobb must show: (1) he

engaged in a protected activity; (2) he was later subjected to an adverse employment action; and (3) a causal link exists between the two. *Tornabene*, 156 F. Supp. 3d at 1248 (discussing retaliation under § 659A.030(f)); *Larmanger*, 895 F. Supp. 2d at 1053 (discussing retaliation under § 659A.199). If Cobb satisfies this burden, Intel must articulate a legitimate, nondiscriminatory reason for his termination. *Larmanger*, 895 F. Supp. 2d at 1049. If Intel does so, Cobb bears the burden of showing that Intel's proffered explanation is merely a pretext for retaliation. *Id.* To avoid summary judgment on the causation element of his retaliation claims, Cobb must submit evidence that, when viewed in his favor, would show that Intel's allegedly "wrongful purpose is a factor that made a difference in the discharge decision." *Larmanger*, 895 F. Supp. 2d at 1049 (quoting *Estes v. Lewis & Clark Coll.*, 152 Or. App. 372, 381 (1998) (simplified)). "To show the requisite causal link, the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982). "Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity." *Id.*

### 1.    ORS § 659A.030(1)(f)

Intel contends that Cobb cannot establish a *prima facie* case of retaliation under ORS § 659A.030(1)(f) because Cobb has not shown that he complained of age discrimination until after Intel issued the WW/CAP. Because Cobb testified in his deposition that he avoided mentioning age discrimination until after he was terminated, Intel contends that he therefore cannot establish a genuine issue of material fact on causation. (Cobb Dep. 37:16–40:2.) And,

Intel argues, Cobb has identified no evidence showing a causal link between his complaint about age discrimination and his termination. In Intel's view, he cannot establish causation.

In his responsive briefing, Cobb does not address the retaliation claim based on reporting age discrimination and thus appears to concede it. Rightfully so. Cobb's complaint does not specify when he complained of age discrimination. Moreover, during his deposition testimony and again during oral argument, Cobb he stated that he avoided complaining about age discrimination until *after* his termination.

Q.      . . . When was the first time that you complained to Intel about age discrimination?

A.      That's a good question. I wanted to continue working at Intel more than anything. . . . So I avoided at all costs bringing up the word age discrimination because in my view when you mention that you are throwing a bomb into this relationship and I avoided mentioning that religiously.

Q.      Okay. And, in fact, you didn't mention it until after you received the corrective action plan; isn't that correct?

A.      I'm not quite sure when I – when I mentioned it. Yeah, for me it became something I was going to pursue aggressively after I was fired and it was clear there was no chance that I was going to return to employment there[.]

. . . .

Q.      . . . And my question is if we want to determine the earliest date that you raised a complaint of age discrimination, that would be in the written documentation that you have provided to Intel; isn't that correct?

A.      It is likely that it would be. . . . And I can't say with – I can't say with absolute certainty when I first brought it up with Intel. It was something I wanted to avoid.

(Coles Decl. Ex. 3, Cobb Dep. 37:16–37:13.) Cobb's own testimony, therefore, shows that he avoided discussing age discrimination during his employment, undercutting his retaliation claim.

Intel's documentation also undermines his retaliation claim. In Cobb's November 5, 2018 ODI complaint, he stated that Mahoney has a personal grudge against him "for no apparent reason, other than perhaps my age." (Egusa Decl. Ex. 10.) Cobb's ODI complaint, however, was opened three months after Mahoney expressed performance concerns to Cobb (Mahoney Decl. Ex. 11) (July 23, 2018 one-on-one meeting stating "failure to improve your performance may lead to disciplinary action"), and after Mahoney issued a written warning and implemented the corrective action plan (Mahoney Decl. Ex. 21) (WW/CAP signed by Mahoney on October 31, 2018 and Cobb on November 5, 2018). That timing shows that Cobb's protected activity followed Intel's concerns about Cobb's performance, thus defeating his *prima facie* case.

And Cobb presents no direct or circumstantial evidence of a causal nexus – Cobb identifies no evidence that Mahoney knew Cobb filed the November 5 ODI or that Mahoney was aware of its contents. Thus, Cobb has not shown that his report of age discrimination played any role in his termination, let alone was a "factor that made a difference." *See Larmanger*, 895 F. Supp. 2d at 1049 (stating that to survive summary judgment on retaliation, employee must show that "the employer would not have made the same decision absent a discriminatory motive" (simplified)). Viewing the evidence in the light most favorable to Cobb, he has presented no evidence from which a jury could conclude that he was terminated in retaliation for reporting age discrimination. Intel is granted summary judgment on this claim.

### 2.    ORS § 659A.199(1)

Cobb argues that he was retaliated against for reporting suspected nepotism to HR – that Robins hired his niece Spaulding – and that soon after making his report, Mahoney began his campaign to discredit and discipline him. (Pl.'s Resp. at 45-46.) Cobb contends that he had a good faith belief that nepotism violated internal Intel policy and employment laws applicable to Intel. The temporal proximity alone between his report and Mahoney's criticism of his work, in Cobb's view, raises an inference of causation. (*Id.* at 46.) The court disagrees.

Even if Cobb's report of nepotism was made in good faith and could constitute protected activity under the statute, as argued by Intel, his whistleblower retaliation claim fails because he identifies no causal link between his report of nepotism and his discipline or termination. Cobb has not identified any evidence showing that either Mahoney or Robins were aware that Cobb reported his suspicions of nepotism to Intel's HR department. During his deposition, Cobb admitted that he asked Mahoney if Spaulding was Robins' niece but admits he did not use the term "nepotism." (Cobb Dep. 36:9–37:11.) And Cobb testified that he had no knowledge that Robins was aware of Cobb's nepotism concerns. (Cobb Dep. 70:8-12). Robins, for his part, testified that he was not aware that Cobb raised any concerns about nepotism until this lawsuit was filed. (Egusa Decl. Ex. 5; Mahoney Decl. ¶ 33.)

Aside from the temporal proximity alone, Cobb identifies no circumstantial evidence that would allow a reasonable jury to infer that Mahoney or Robins somehow learned of his complaint to HR. *See Cohen*, 686 F.2d at 796 (noting it is "essential to a causal link" that the employer was aware of the protected activity); *cf. Karthauser v. Columbia 9-1-1 Commc'ns*

*Dist.*, 647 F. Supp. 3d 992, 1014-15 (D. Or. 2022) (discussing circumstantial evidence showing reasonable inference that decisionmakers became aware of protected conduct through meetings, emails, and friendship). Because Cobb points to no evidence showing that Mahoney or Robins were aware of his nepotism report to HR or circumstantial evidence supporting a reasonable inference that they learned of his report, he fails to create a *prima facie* case on his whistleblower retaliation claim. Consequently, Intel is granted summary judgment on Cobb's ORS § 695A.199(1) claim.

## CONCLUSION

For the above reasons, Intel's motion for summary judgment (ECF No. 27) is GRANTED.

DATED: June 4, 2024.

_____
JEFF ARMISTEAD
United States Magistrate Judge